[L. A. No. 26517. In Bank. Dec. 7, 1961.]

JACK R. MAGIT, Plaintiff and Respondent, v. BOARD OF MEDICAL EXAMINERS OF THE STATE OF CALIFORNIA, Defendant and Appellant.

78

Stanley Mosk, Attorney General, E. G. Funke, Assistant Attorney General, Richard R. Rogan, Chief Deputy Attorney General, and Warren H. Deering, Deputy Attorney General, for Defendant and Appellant.

Mitchell, Silberberg & Knupp, Mendel B. Silberberg, Arthur Groman and Allen Kaufman for Plaintiff and Respondent.

GIBSON, C. J.—The Board of Medical Examiners appeals from a judgment granting a peremptory writ of mandate directing the board to set aside its order revoking the license of Jack R. Magit, a physician and surgeon.

An accusation filed with the board alleged that Dr. Magit, a director and chief anesthesiologist of the Beverly Hills Doctors Hospital, employed Francisco Rios, Luciano Celori, and Ahmet Ozbey to assist him in the practice of medicine and paid them salaries knowing they had no licenses which authorized them to practice medicine in California, that with his authorization they administered anesthetics, including spinal and epidural anesthetics,[1] and treated sick persons, and that he thus violated section 2392 as well as section 2378 considered together with section 2141 of the Business and Professions Code.[2]

After a hearing the board found that Dr. Magit, acting on behalf of the Doctors Hospital, employed Rios, Celori, and Ozbey, that he knew they were not licensed to practice any of the healing arts in California, and that with his knowledge and authorization they administered general, spinal, and epidural anesthetics in the hospital. The board also found that Dr. Magit aided and abetted their practice of medicine and surgery. The board concluded that Dr. Magit was guilty of

---

[1] A spinal anesthetic is applied by injection beneath the membranes of the spinal cord, and an epidural anesthetic by injection within the spinal column but outside the membranes of the spinal cord. (See Blakiston's New Gould Medical Dictionary (1951) p. 63; Dorland, American Illustrated Medical Dictionary (17th ed. 1937) p. 94.)

[2] Section 2392 of the Business and Professions Code provides: "The employing, directly or indirectly, of any suspended, or unlicensed practitioner in the practice of any system or mode of treating the sick or afflicted or in the aiding or abetting of any unlicensed person to practice any system or mode of treating the sick or afflicted constitutes unprofessional conduct within the meaning of this chapter."

Section 2378 provides: "The violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of or conspiring to violate any provision or term of this chapter constitutes unprofessional conduct within the meaning of this chapter."

Section 2141 provides: "Any person, who practices or attempts to practice, or who advertises or holds himself out as practicing, any system or mode of treating the sick or afflicted in this State, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other mental or physical condition of any person, without having at the time of so doing a valid, unrevoked certificate as provided in this chapter, is guilty of a misdemeanor."

unprofessional conduct under section 2392 of the code and was guilty of unprofessional conduct under section 2378 together with section 2141, and it determined that for each of these two violations of professional standards his license ought to be revoked. A petition for reconsideration was denied by the board.

The superior court stayed revocation of the license and reviewed the matter on the record before the board without additional evidence. The court exercised its independent judgment, as it was authorized to do (*Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242, 246 [217 P.2d 630, 18 A.L.R.2d 593]; *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20]), and determined that Dr. Magit was not guilty of unprofessional conduct under the cited sections of the code.

The findings of the court may be summarized as follows: Dr. Magit knew that Rios, Celori, and Ozbey were not licensed to practice medicine in California. At various times, with his knowledge and authorization, they administered anesthetics in the course of operations but never in the absence of supervision, direction, and control of a licensed physician. They did not diagnose or treat sick and afflicted persons with his knowledge or authorization. The three men were ''doctors of medicine'' with specialized training in anesthesiology and were highly competent anesthetists.[3] Prior to his work at the Doctors Hospital Rios had been employed by the State of California to administer anesthetics at Patton State Hospital. It is a common and recognized practice in California and in other parts of the United States for licensed physicians to authorize and permit persons not licensed as physicians to administer anesthetics. Dr. Magit acted in the utmost good faith; he relied on legal advice from the attorney for the Doctors Hospital that authorizing unlicensed persons to administer anesthetics was not illegal, and he was justified in so relying. He believed that such was the common and recognized practice in California and in other parts of the United States, and he immediately terminated the practice upon learning that it was considered illegal by the board.

It is not disputed that Rios, Celori, and Ozbey administered anesthetics at the Doctors Hospital with the authorization of

[3]The evidence indicates that Rios had a medical degree from a school in Mexico, Celori from a school in Italy, and Ozbey from a school in Turkey; all three had their education as anesthesiologists in the United States, but they were not licensed to practice any of the healing arts in any of the states.

Dr. Magit and that they were not licensed to practice any of the healing arts in California. The determination of the court that they did not, with his permission, diagnose or treat sick and afflicted persons amounts to a conclusion of law that the administration of anesthetics does not constitute a mode of treating the sick within the meaning of sections 2141 and 2392 of the code. Whether this conclusion is correct is one of the principal questions to be decided in this case. The finding of the court that it is a common practice in California and elsewhere to permit persons not licensed as physicians to administer anesthetics is vague in that it does not show what persons in addition to licensed physicians customarily administer anesthetics. As we shall see, there is no substantial evidence that the common practice referred to exists with respect to persons other than nurses and interns.

Our statutes do not specifically provide that one who administers anesthetics must have a license to practice medicine or any of the other healing arts. Whether the administration of anesthetics by the three unlicensed persons was illegal and made Dr. Magit guilty of unprofessional conduct depends primarily upon whether it constituted the practice of "any system or mode of treating the sick or afflicted" within the meaning of sections 2141 and 2392. If the administration of anesthetics does not come under these provisions, everyone would be free to administer them since there is no other statutory restriction which would apply. ▪ Those who administer anesthetics "use drugs or what are known as medical preparations in or upon human beings" and, in administering spinal or epidural anesthetics, they "penetrate the tissues of human beings" within the meaning of section 2137 of the code, which includes the quoted terms in setting forth the practice authorized by a physician's and surgeon's certificate.[4]

▪ The application of anesthetics is obviously an integral part of the surgical treatment which it facilitates, and it falls directly within the language of sections 2141 and 2392.

▪ Moreover, the code speaks of anesthetics in a manner which indicates a legislative intent that their use be considered as coming within the practice of medicine. Section 2192

[4]Section 2137 of the Business and Professions Code reads: "The physician's and surgeon's certificate authorizes the holder to use drugs or what are known as medical preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions.

includes in the curriculum required of applicants for a physician's and surgeon's certificate adequate instruction in "surgery, including . . . [a]nesthesia," and section 2139 provides that no chiropodist shall "use an anesthetic other than local." ■■■ Section 2139, of course, is not intended to prohibit chiropodists from performing acts generally permitted to be done by everyone, and since it precludes a chiropodist from administering general, spinal, or epidural anesthetics, it clearly indicates that the right to give such anesthetics is restricted. (*Cf. State* v. *Catellier*, 63 Wyo. 123 [179 P.2d 203, 218] [construing Wyoming statute similar to § 2139].)

In accord with the conclusion that anesthetization constitutes a mode of treating the sick is *People* v. *Nunn*, 65 Cal.App. 2d 188, 190 [150 P.2d 476], which affirmed an osteopathic physician's conviction of conspiracy to cause a chiropractor to practice as a surgeon and to administer drugs. The opinion sets forth among the incriminating facts the administration of anesthetics by the chiropractor in the presence of the osteopath who knew that the chiropractor "had no license to administer the anesthetic, apply the hypodermic needle or give any drug that comes within *materia medica*." The desirability of restricting the right to administer anesthetics was recognized in *Painless Parker* v. *Board of Dental Examiners*, 216 Cal. 285, 295 [14 P.2d 67], where this court said: "The right to administer anesthetics which produce local or general insensibility to pain, or drugs which may produce total or semi-unconsciousness, or otherwise affect the nervous system, should be withheld not only from all persons who are not highly skilled in the knowledge of and the use of said drugs, but also from persons who cannot produce evidence of good moral character."

■■■ Under some circumstances, persons not licensed to practice medicine in California may legally perform some medical acts, including the administration of anesthetics. For example, sections 2147-2147.6 of the Business and Professions Code permit certain persons engaged in medical study and teaching at approved hospitals to perform acts which constitute treatment of the sick, but no such exemption is applicable to the activities of Rios, Celori, and Ozbey at the Doctors Hospital, which concededly was not approved for the training of students or interns. Another example is found in *Chalmers-Francis* v. *Nelson* (1936) 6 Cal.2d 402 [57 P.2d 1312], where it was held that a licensed registered nurse

should not be restrained from administering general anesthetics in connection with operations under the immediate direction and supervision of the operating surgeon and his assistants.

At the time of the *Chalmers-Francis* case the statutes provided for the licensing of nurses but did not define or restrict their functions. In the absence of a statutory definition the court looked to the existing custom and practice concerning the administration of anesthetics by nurses. ▮ It has generally been recognized that the functions of nurses and physicians overlap to some extent, and a licensed nurse, when acting under the direction and supervision of a licensed physician, is permitted to perform certain tasks which, without such direction and supervision, would constitute the illegal practice of medicine or surgery.[5] No custom concerning the giving of anesthetics by persons other than licensed nurses was considered in the opinion, and the court did not discuss whether the administration of anesthetics by nurses or others constituted the practice of medicine. The decision was thus based on the special status of a licensed nurse and has no application to others.

▮ Three years after the *Chalmers-Francis* decision, a number of provisions concerning nursing were added to the code, among which were sections 2725 and 2726.[6] Section 2725 defines the practice of nursing and shows a legislative intent that a nurse may, under the direction of a licensed physician, perform services which require technical skill and

---

[5] In Lesnik and Anderson, Nursing Practice and the Law (2d ed. 1955) pp. 277-279, it is said that nurses perform many functions that are medical acts, and, in the absence of statute, custom and usage generally will control the nature and scope of medical acts performed by them. Among the minimum requirements for a nurse's authority to perform such acts are that she proceed under the order and direction or supervision of a licensed physician and that she comprehend the cause and effect of the order.

[6] Section 2725 of the Business and Professions Code provides in part: "The practice of nursing within the meaning of this chapter [Nursing] is the performing of professional services requiring technical skills and specific knowledge based on the principles of scientific medicine, such as are required by means of a prescribed course in an accredited school of nursing as defined herein, and practiced in conjunction with curative or preventive medicine as prescribed by a licensed physician and the application of such nursing procedures as involve understanding cause and effect in order to safeguard life and health of a patient and others."

Section 2726 provides: "This chapter [Nursing] confers no authority to practice medicine or surgery or to undertake the prevention, treatment or cure of disease, pain, injury, deformity, or mental or physical condition in violation of any provision of law."

medical knowledge. Section 2726 states that the chapter dealing with nursing does not confer any authority to practice medicine or surgery. These sections must be construed together, and when this is done it is clear that section 2726 does not mean that nurses are precluded from performing all acts which are medical or surgical in character but, rather, that they would be guilty of illegally practicing medicine or surgery only if their conduct in performing such acts did not come within the permissible scope of a nurse's functions as defined in section 2725. ▉ The definition in section 2725 is so broad that the administration of certain forms of anesthetics by a registered nurse, acting under the immediate direction and supervision of a licensed physician, may come within its scope. To what extent and under what conditions it authorizes nurses to perform such acts is not before us, and we need note only that any authority they may have in this field is derived from their special statutory position and does not affect the authority of others. Obviously, the *Chalmers-Francis* decision related only to the then existing practice and to the particular general anesthetics in use at that time, and it is not controlling with respect to any other anesthetic or any other method of producing anesthesia.

▉ In the absence of some statutory basis for an exception, such as those with respect to nurses and persons engaged in medical study or teaching, one who is not licensed to practice medicine or surgery cannot legally perform acts which are medical or surgical in character, and supervision does not relieve an unauthorized person from penal liability for the violation of statutes which, like section 2141 of the code, prohibit the unlicensed practice of medicine. (*State* v. *Cornelius,* 200 Iowa 309 [204 N.W. 222, 223] ; *State* v. *Scopel,* (Mo.) 316 S.W.2d 515, 519; *State* v. *Young* (Mo.App.) 215 S.W. 499, 501; *State* v. *Paul,* 56 Neb. 369 [76 N.W. 861, 862] ; *Gobin* v. *State,* 9 Okla. 201 [131 P. 546, 547, 44 L.R.A. N.S. 1089].)

▉ Likewise, a licensed practitioner who aids and abets the performance of medical or surgical acts by an unauthorized person is guilty of unprofessional conduct under section 2392 of the code even though the acts are done under his immediate direction and supervision. (*Newhouse* v. *Board of Osteopathic Examiners,* 159 Cal.App.2d 728, 732 [324 P.2d 687] [license of osteopathic physician and surgeon suspended for 30 days because he directed a chiropractor to insert sutures in the body of a patient under his supervision] ; *Garfield* v.

*Board of Medical Examiners,* 99 Cal.App.2d 219, 230 [221 P.2d 705] [licensed physician operating a hospital held subject to discipline because he employed physicians licensed in other states but not in California to practice medicine under supervision in the hospital].) It should be noted that in the *Garfield* case the physicians, while not licensed in California, were graduates of approved medical schools, had served internships in approved hospitals, and were eligible to be licensed in this state on a reciprocity basis. (99 Cal.App.2d at p. 222.) ▉▉ The fact that, as is also true in the present case, the unlicensed physicians had training enabling them to practice competently did not exculpate the physician who aided them in practicing. This is the necessary result of our statutory system which, in order to assure the protection of the public, requires that a person's competency be determined by the state and evidenced by a license.

▉▉ It is argued that in construing the provisions of the code we should take into consideration an asserted custom in California of permitting persons other than licensed physicians and surgeons to administer anesthetics. There was evidence from which it might be inferred that in California it was common practice to permit general anesthetics to be administered by registered nurses, who, as we have seen, are authorized by statute to perform some medical acts. However, there was no substantial evidence of a common practice in California to permit anesthetics to be given by persons who have no authority whatever to perform medical acts.

▉▉ One of the matters relied upon by Dr. Magit with respect to common practice is an affidavit by 55 doctors familiar with the Doctors Hospital, each of whom stated among other things that "it is common practice in the State of California for persons not licensed to practice medicine and surgery to administer anesthetics and to give hypodermic injections." This statement is framed in such general terms that it is of no value here. It does not specify what persons other than licensed physicians commonly administer anesthetics, and it cannot reasonably be understood to mean that the performance of this function is regularly left to all persons regardless of their qualifications, even to those without any knowledge or training which would fit them for the task. As far as appears from the affidavit, the averred common practice may have existed only with respect to persons authorized by the code to perform medical acts, such as registered nurses and interns. Thus the quoted statement does not constitute sub-

stantial evidence of a custom existing with respect to persons such as Rios, Celori, and Ozbey, who have no statutory authority to perform medical acts.[7]

 In support of his claim regarding common practice Dr. Magit also relies on his testimony concerning his knowledge and experience with respect to the giving of anesthetics in California by persons who were not licensed physicians. Insofar as this testimony consists of a general reference to persons not licensed as physicians, it is without value here for the reasons discussed above in connection with the general statement in the affidavit of the 55 doctors. The only specific instances mentioned by Dr. Magit in which persons other than nurses or licensed physicians administered anesthetics were those relating to Rios and "a chap" from the East, both of whom he saw give anesthetics at the Queen of Angels Hospital. Rios testified that he also gave anesthetics at the Patton State Hospital. So far as appears from the record, when Rios and the other person mentioned gave anesthetics at these hospitals their positions may have been such that they were permitted by statute to perform medical acts.[8] In any event the testimony regarding a few isolated examples is insufficient to prove the existence of a common practice.

---

[7]Each affiant also averred that, according to his understanding, the activities of Dr. Magit concerning the administration of the anesthetics by Rios, Celori, and Ozbey did not constitute unprofessional conduct or aiding and abetting unlicensed persons in the diagnosis and treatment of disease, and that he does not believe that the administration of an anesthetic by a person not licensed to practice medicine in California constitutes the diagnosis or treatment of disease or the practice of medicine. These averments are incompetent as evidence of the legality of Dr. Magit's conduct because they state the opinion of the affiants about questions of law to be decided by the board and the court. (*Richman* v. *San Francisco etc. Ry.*, 180 Cal. 454, 463 [181 P. 769] [error to admit opinions as to proper interpretation of operating rules of railroad]; *Carter* v. *City of Los Angeles*, 67 Cal.App.2d 524, 526-528 [154 P.2d 907] [error to ask expert whether suspension of employees was in accordance with accepted principles of civil service]; *Commonwealth* v. *Porn*, 196 Mass. 326 [82 N.E. 31, 32, 13 Ann.Cas. 569, 17 L.R.A. N.S. 94] [opinions that undisputed acts of midwife did not constitute practice of medicine, not admissible]; see 20 Am.Jur. 672-673; 19 Cal.Jur.2d 11-12.)

[8]The Queen of Angels Hospital was approved for the training of interns (Cal. Admin. Code, tit. 16, §§ 1330, 1342), and under section 2147.5 of the Business and Professions Code interns, graduate students, residents or assistant residents in such a hospital may perform medical acts. Rios testified that he was an intern at the Queen of Angels Hospital. While, according to Dr. Magit's testimony, the "chap" from the East was not an intern, he was a medical school graduate and may have been entitled to perform medical acts as a graduate student, resident, or assistant resident. So far as concerns the status of Rios at Patton

We are asked by Dr. Magit to consider a statement in Regan, Doctor and Patient and the Law (3d ed. 1956) p. 543, a book which apparently was not before the board or the trial court, to the effect that it is an open question in most states who may legally administer an anesthetic and that in nearly all states the custom has developed to have "almost anyone" administer the anesthetic. The book, however, does not give any authority for the statement and does not mention California in this connection. It therefore is not authority for the proposition that such a custom exists here.

The finding of the court that Rios, Celori, and Ozbey never, with the knowledge of Dr. Magit, administered anesthetics in the absence of supervision and control of a licensed physician is not relevant to the question of Dr. Magit's guilt because, as we have concluded, the administration of anesthetics by an unlicensed person is illegal even if performed under such supervision.

It follows from what we have said that Dr. Magit was guilty of unprofessional conduct in violation of section 2392 since he aided and abetted the practicing of medicine by three unlicensed persons and that this conduct also violated section 2378 considered together with section 2141. The contrary conclusions reached by the trial court are erroneous, and the judgment must be reversed.

The question remains whether the penalty imposed on Dr. Magit was proper. The court did not make a finding on this point because it determined that Dr. Magit was not guilty of any unprofessional conduct. In its oral opinion, however, the court stated that, if there had been evidence of a violation as charged, it "would have been constrained to hold that the severity of this punishment was unjustified to such an extent that it was arbitrary and capricious" and would have referred the case back to the board for further consideration.

In a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion. (See *Martin* v. *Alcoholic Beverage etc. Appeals Board*, 52 Cal.2d 287, 293 [341 P.2d 296]; *Bonham* v. *McConnell*, 45 Cal.2d 304, 306 [288 P.2d 502].)

---

State Hospital, the only evidence is that he received papers from Sacramento that he was accepted to give anesthetics there and at the time he was at that hospital section 6558 of the Welfare and Institutions Code permitted state hospitals to employ interns subject to approval of the Department of Mental Hygiene.

In applying the rule to the present case, the following circumstances must be considered: The court on sufficient evidence found that Dr. Magit acted in the utmost good faith, that Rios, Celori, and Ozbey were doctors of medicine with specialized training in anesthesiology and were highly competent anesthetists, and that on the basis of legal advice Dr. Magit was justified in assuming that the authorizing of the three unlicensed men to administer anesthetics was legal. In considering whether persons such as Rios, Celori, and Ozbey could legally administer anesthetics Dr. Magit was confronted with a question not specifically answered by the code or by any decision of our courts, and the *Chalmers-Francis* case had held that, in addition to licensed physicians, licensed nurses could administer anesthetics.[9]

Under the circumstances of this case the imposition of the maximum penalty (revocation of Dr. Magit's license), which would prevent him from being gainfully occupied in his profession, was a clear abuse of discretion. "Suspending judgment" or "Placing . . . upon probation," as permitted by section 2372 of the code, would be a more appropriate discipline,[10] and the case should be returned to the board for reconsideration of the penalty to be imposed. (*Cf. Bonham* v. *McConnell*, 45 Cal.2d 304, 306 [288 P.2d 502]; *Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242, 252 [217 P.2d 630, 18 A.L.R.2d 593].)

The judgment is reversed, and the trial court shall enter judgment commanding the board to set aside its order of revocation and to determine the discipline to be imposed in the light of this opinion.

Traynor, J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

---

[9] The averments in the affidavit of the 55 doctors regarding their understanding of the legality of Dr. Magit's conduct (see fn. 8) show that many physicians shared Dr. Magit's mistaken understanding of the law, and the trial court stated that the *Chalmers-Francis* case was decisive here.

[10] Section 2372 of the Business and Professions Code provides in part: "The board shall discipline the holder of any certificate, whose default has been entered or who has been heard by the board and found guilty, by any of the following methods: (a) Suspending judgment. (b) Placing him upon probation. (c) Suspending his right to practice for a period not exceeding one year. . . ."