[Civ. No. 22608. First Dist., Div. One. Mar. 9, 1966.]

*DOUGLAS PIERCE BROWN, Plaintiff and Respondent, v. MILTON G. GORDON, as Real Estate Commissioner, etc., Defendant and Appellant.

*Reporter's Note: This case was previously entitled "Brown v. Savage."

Thomas C. Lynch, Attorney General, and Eldon M. Johnson, Deputy Attorney General, for Defendant and Appellant.

Clifford J. Krueger for Plaintiff and Respondent.

MOLINARI, J.—This is an appeal by the Real Estate Commissioner of the State of California from the judgment of the superior court ordering that a writ of mandate be issued to compel the commissioner to vacate his decision revoking the real estate broker's license of Douglas Pierce Brown and to reconsider this decision and determine the proper penalty, if any, to be imposed upon Brown.

On August 3, 1962, an accusation was filed before the commissioner charging Brown with an act constituting grounds for disciplinary action under section 10176, subdivisions (e) and (i), and 10177, subdivision (f), of the Business and Professions[1] Code. Specifically the accusation alleged that Brown received $1,000 from one Edwin Hoch as a deposit on an offer to purchase a piece of real property and that instead of depositing and maintaining this money in a trust account with a bank or other recognized depository, Brown commingled this money with his own and converted it to his own use and benefit without the knowledge and consent of Hoch. A hearing was had on June 6, 1963 and on June 7, 1963 the hearing officer rendered his proposed decision recommending that Brown's license be revoked. In this proposed decision the hearing officer made the following findings of fact: "III On or about March 9, 1962, while performing acts for which a real estate license is required, respondent took and received in trust from Edwin Hoch (hereinafter referred to as buyer) the sum of $1,000 as a deposit on an offer to purchase certain real property known as 340 Grove Street, San Francisco, California. IV Respondent deposited said $1,000 in his trust

---

[1]These sections provide in pertinent part as follows: "§ 10176. The commissioner may, upon his own motion, and shall, upon the verified complaint in writing of any person, investigate the actions of any person engaged in the business or acting in the capacity of a real estate licensee within this State, and he may temporarily suspend or permanently revoke a real estate license at any time where the licensee, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter has been guilty of any of the following: . . . (e) Commingling with his own money or property the money or other property of others which is received and held by him. . . . (i) Any other conduct, whether of the same or a different character than specified in this section, which constitutes fraud or dishonest dealing." "§ 10177. The commissioner may suspend or revoke the license of any real estate licensee, or may deny the issuance of a license to an applicant, who has done any of the following: . . . (f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license."

account and withdrew the same on the same day. He thereafter failed to maintain said $1,000 in a trust account with a bank or other recognized depository but, without the knowledge and consent of buyer, commingled said funds with his own and converted them to his own use and benefit." This proposed 'decision was adopted by the commissioner on June 12, 1963, to be effective on July 3, 1963,[2] whereupon the instant mandate proceeding ensued.

Following the issuance of the alternative writ and the commissioner's return to the writ by way of answer, the matter came on for hearing before the court below and was submitted upon the record of the proceedings before the commissioner. The court thereafter made its decision by way of findings of fact in relevant part as follows: "VII That petitioner did, on or about March 9, 1962, receive in trust from Edwin Hoch, the sum of $1,000.00 as a deposit on an offer to purchase certain real property commonly known as 340 Grove Street, San Francisco, California. That petitioner deposited said $1,000.00 in his trust account and withdrew the sum on the same day, and that thereafter, petitioner failed to maintain said $1,000.00 in a trust account with a bank or other recognized depository. VIII That the petitioner did not intentionally misappropriate the $1,000.00 deposited with him by Edwin Hoch. That petitioner only showed bad judgment as to his handling of said $1,000.00 deposit. That the 'decision of the Commissioner to revoke petitioner's license is a prejudicial abuse of discretion, is arbitrary and capricious, in that the findings show petitioner only used bad judgment in handling the sum of $1,000.00 deposited with him by Edwin Hoch, and the penalty of revocation is excessive." From these facts the trial court concluded: "II That the Commissioner acted arbitrarily and capriciously and prejudicially abused his discretion in revoking the real estate license of petitioner, and the Court may remand this matter to the Commissioner for

[2]The record discloses that a previous hearing was held on October 23, 1962 on the charges contained in the accusation, following which the hearing officer recommended a revocation of Brown's license. This decision was adopted by the commissioner, whereupon Brown filed a petition for writ of mandate in the superior court. Following the issuance of an alternative writ, a hearing was had in the superior court, which resulted in the granting of a peremptory writ of mandate ordering the commissioner to vacate the submission of the case and further ordering the hearing officer to receive into evidence certain additional testimony and documents and to render a proposed decision based on this additional testimony and the evidence previously received. The hearing of June 6, 1963 was held pursuant to this peremptory writ.

reconsideration of his decision to revoke the license of petitioner."

Pursuant to these findings and conclusions of law the trial court entered its judgment ordering that a peremptory writ be granted "vacating the decision of the Commissioner and remanding the submission of this case and ordering the Real Estate Commissioner to reconsider his decision of revoking the petitioner's license as a Real Estate Broker, and to take such evidence as is necessary to determine the proper penalty, if any, to be imposed upon the petitioner." From this judgment the commissioner has filed this appeal.

Although the judgment purports to vacate the decision of the commissioner in its entirety, it is apparent from its import, in the light of the trial court's findings and conclusions of law, that it only vacates that portion of the decision which imposed the penalty of revocation. Its effect is to command the commissioner to reconsider the penalty imposed. The "finding" that Brown did not intentionally misappropriate the said sum of $1,000 and that he only exercised "bad judgment" in "handling" said deposit is directed to the question of penalty rather than to the question of culpability. In essence, therefore, the trial court's judgment amounted to an adjudication that Brown was guilty of unprofessional conduct under the cited sections of the Business and Professions Code but that the commissioner abused his discretion in imposing the penalty of revocation.

In view of the foregoing the sole issue which confronts us is whether the trial court correctly determined that the commissioner abused his discretion in revoking Brown's license. We are thus called upon to determine whether the circumstances of this case warrant the penalty imposed in the light of applicable principles. We first consider the circumstances as disclosed by the record.

In February 1962 Hoch became interested in trading two of his properties, one on Page Street and the other on Oak Street in San Francisco, for an apartment house on Grove Street in San Francisco. The transaction was to be handled for Hoch by Brown in his capacity as a licensed real estate broker. On March 9, 1962, after Hoch's initial offer had been rejected by the seller, who was represented by Alberton Realty, Hoch authorized Brown to make another offer of exchange. Hoch then signed the original and carbon copy of an "Agreement of Exchange," which provided that Hoch, as the first party, would exchange his two properties for the Grove Street prop-

erty and would in addition pay to the second party, "the vested owner of record" of the Grove Street property, the sum of $79,500. At the same time Hoch gave Brown a check for $1,000. On the face of this check appeared the words "Deposit—Grove St. Property." On that same day Brown approached Alberton with this offer of exchange. Alberton, however, rejected the offer, whereupon Brown made a second offer to Alberton, which, as far as Alberton was concerned, was a straight cash purchase of the Grove Street property by one William Zietzke for $185,000. This offer was accepted by Alberton on March 9, 1962 and on the same day a "Uniform Agreement of Sale and Deposit Receipt" was signed by Brown on behalf of Zietzke as purchaser and by William J. Lowenberg, as agent for Alberton Realty.

After Alberton had accepted this cash offer, Brown signed Zietzke's name as second party to the carbon copy of the "Agreement of Exchange" which Hoch had signed that morning. Brown then contacted Hoch and informed him that " 'The deal is accepted. We have you a true and direct trade, and everything will be all right.' " Later that day Brown deposited the $1,000 check from Hoch in his trust account at the Sunset Branch of the Bank of America. On the same date Brown withdrew from this account, which had a deficit balance of $59.38 prior to the $1,000 deposit, six checks totaling $420. These checks were for Brown's personal expenses. Shortly after March 9, 1962 Hoch refused to proceed with the transaction and the prospective exchange collapsed. Brown refused to return the $1,000 deposit to Hoch and these disciplinary proceedings followed. The $1,000 was, however, ultimately returned to Hoch by Brown on March 7, 1964.

At the administrative hearings Brown admitted that he put the $1,000 deposit into his trust account on March 9, 1962 and on the same day withdrew $420 from this account for personal expenses. Brown gave the following explanations for his conduct: He was using his trust account as a personal account to avoid possible attachment of the account as a result of a civil litigation in which he was involved; by immediately cashing the check, he felt that Hoch would be less likely to renege on his offer; he was entitled to the $1,000 as earned commission; and he gave the $1,000 to Zietzke as a principal, thus allegedly complying with section 2832 of title 10 of the California Administrative Code which allows

trust funds to be placed in the hands of a principal.[3] As to this defense, Brown and Zietzke testified at the hearings that on March 9, 1962 Brown went to the home of Zietzke, his father-in-law, and gave Zietzke $1,000 in cash,[4] indicating to Zietzke that he was the buyer and seller in a deal. According to Brown, this $1,000 which he gave to Zietzke was not the same $1,000 which he had received from Hoch, but was a parallel $1,000 that Brown had available to him. Zietzke testified that after the trade collapsed he retained one-half of the $1,000 and gave $500 back to Brown, although Zietzke was not able to particularize any reason for his keeping $500 or for his returning $500 to Brown.

It is apparent from the evidence summarized above that Brown was guilty of unprofessional conduct in violation of the cited sections of the Business and Professions Code. However, the conclusion reached by the trial court that such conduct was not intentional is unsupported by the record. Brown freely admitted that he made withdrawals of $420 for personal expenditures against the $1,000 which he deposited in his trust account. Moreover, all of Brown's explanations for his conduct indicate that he intentionally acted as he did. ▪ The fact that he may have been unaware of his obligations as a trustee of the $1,000 and that he may have thought that he was justified in using this money for his personal expenses does not furnish an excuse for his conduct or establish that it was done unintentionally. (Civ. Code, §§ 2229 and 2236; *Rhoades* v. *Savage,* 219 Cal.App.2d 294, 299 [32 Cal.Rptr. 885]; *Estate of McCabe,* 87 Cal.App.2d 430, 435 [197 P.2d 35]; *Estate of Evans,* 62 Cal.App.2d 249, 258 [144 P.2d 625]; II Scott on Trusts (2d ed.) §§ 179.1 and 201, pp. 1315, 1508.) ▪ Among the qualifications of a real estate broker is a full understanding of the essential duties and obligations between principal and agent, the principles of real estate practice and the canons of business ethics. (Bus. & Prof. Code, § 10153, subd. (c).) These qualifications must be shown before a real estate license may be issued to an

---

[3]This section of the Administrative Code, as in effect in March 1962, provided as follows: ''Commingling within the meaning of Sections 10176(e) . . . of the Business and Professions Code is defined as failure to deposit or place trust funds received (1) into a neutral escrow depository or (2) in the hands of principals, or (3) in a trust fund account in accordance with Section 2830 above, by the next business day following their receipt. . . .''

[4]At the first administrative hearing, Brown testified that he gave Zietzke the sum of $1,000 in the form of a cashier's check.

applicant. (Bus. & Prof. Code, § 10153.) Moreover, Brown testified that he was aware of the provisions of the law regarding the setting up and maintaining of a trust account, and that he was aware of the provisions applicable to "commingling." As to the court's conclusion that Brown used "bad judgment," suffice it to say that, assuming Brown's conduct could be rationalized as such, it was no justification for a violation of Brown's duty as trustee which was an absolute one. (Civ. Code, §§ 2229 and 2236; *Rhoades* v. *Savage, supra,* pp. 299-300; *Estate of McCabe, supra,* p. 435; Scott, *supra.*)

 Since the trial court concluded that the penalty of revocation in the instant case constituted a clear abuse of discretion by the commissioner, the question remains whether such penalty is so harsh as to constitute an abuse of discretion as a matter of law. It is well settled that in a mandamus proceeding to review an administrative order the determination of penalty by the administrative body will not be disturbed unless there is a clear abuse of discretion. (*Tracy* v. *Contractors' State License Board,* 63 Cal.2d 598, 601 [47 Cal.Rptr. 561, 407 P.2d 865]; *Martin* v. *Alcoholic Beverage etc. Appeals Board,* 52 Cal.2d 287, 291, 293 [341 P.2d 296]; *Harris* v. *Alcoholic Beverage etc. Appeals Board,* 62 Cal.2d 589, 594 [43 Cal.Rptr. 633, 400 P.2d 745]; *Macfarlane* v. *Department of Alcoholic Beverage Control,* 51 Cal.2d 84, 91 [330 P.2d 769]; *Magit* v. *Board of Medical Examiners,* 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816].) Although the administrative body has broad power with respect to the determination of the penalty to be imposed, this power is not absolute or unlimited, but must be exercised with judicial discretion. (*Harris* v. *Alcoholic Beverage etc. Appeals Board, supra,* p. 594; *Martin* v. *Alcoholic Beverage etc. Appeals Board,* 55 Cal.2d 867, 875 [13 Cal.Rptr. 513, 362 P.2d 337].) The term "judicial discretion" is defined as follows: "The discretion intended . . . is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia,* but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (*Bailey* v. *Taaffe,* 29 Cal. 422, 424; *Harris* v. *Alcoholic Beverage etc. Appeals Board, supra,* pp. 594-595.) "Abuse of discretion" in the legal sense is defined as discretion exercised to an end or purpose

not justified by and clearly against reason, all of the facts and circumstances being considered. (*Sharon* v. *Sharon,* 75 Cal. 1, 48 [16 P. 345]; *Kalmus* v. *Kalmus,* 103 Cal.App.2d 405, 415 [230 P.2d 57]; *Schaub's Inc.* v. *Department of Alcoholic Beverage Control,* 153 Cal.App.2d 858, 866 [315 P.2d 459]; *Crummer* v. *Beeler,* 185 Cal.App.2d 851, 858 [8 Cal. Rptr. 698].)

In determining whether there has been an abuse of discretion the Supreme Court of this state has stated that "If reasonable minds might differ as to the propriety of the penalty imposed, this fact serves to fortify the conclusion that the . . . [administrative body] acted within the area of its discretion." (*Harris* v. *Alcoholic Beverage etc. Appeals Board, supra,* p. 594; see also *Martin* v. *Alcoholic Beverage etc. Appeals Board, supra,* 52 Cal.2d at p. 294.) It is equally well settled that in reviewing the penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. (See *Macfarlane* v. *Department of Alcoholic Beverage Control, supra,* p. 91.) Such interference, in the light of the foregoing authorities, will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion.

Applying the applicable principles to the instant case, we cannot say, notwithstanding our own predilections, that as a matter of law the penalty of revocation was so excessive as to amount to an abuse of discretion. "One of the purposes of the Real Estate Act is to insure, as far as possible, that real estate brokers and salesmen will be honest, truthful and of good reputation." (*Buckley* v. *Savage,* 184 Cal. App.2d 18, 31-32 [7 Cal.Rptr. 328]; *Riley* v. *Chambers,* 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418].) As a real estate broker Brown was under a duty to be honest and truthful in his dealings. (*Ward* v. *Taggart,* 51 Cal.2d 736, 741 [336 P.2d 534]; Bus. & Prof. Code, §§ 10150, 10176.) Not only was that duty breached in the instant case but Brown's conduct also involved a breach of the duty of a fiduciary. We are not unmindful that Brown had been a broker for 18 years and had no prior disciplinary record. However, it should be noted that restitution was not made until after the

termination of the disciplinary proceedings and the imposition of penalty, and not until these proceedings were before the superior court. All of the facts and circumstances must be looked at in the light of the basic reason for disciplinary action in matters involving acts warranting the suspension or revocation of real estate licenses—the protection of the public against unethical and dishonest conduct on the part of those engaged in the real estate business. Accordingly, we cannot say that under the circumstances of this case reasonable minds can only reach the conclusion that the penalty is excessive. On the record the penalty of revocation appears to us to be severe. However, we cannot conclude in the light of the gravity of the offense that the administrative hearing officer, who recommended the penalty of revocation, and the commissioner, who imposed the penalty, did not act as reasonable men. In the judgment of the hearing officer, who heard the evidence and observed the demeanor of Brown while testifying, and the commissioner, who was specifically entrusted by law to make the determination of penalty, the penalty imposed was deemed **proper and commensurate** with the gravity of the offense and the public interest. In the light of all the facts and circumstances we cannot say that the commissioner's determination is clearly against reason. Rather we are constrained to say, as observed in *Harris,* that where reasonable minds differ as to the propriety of the penalty imposed, this fact serves to fortify the conclusion that the commissioner acted within the area of his discretion.

Brown relies upon *Magit* and *Harris.* In *Magit,* the doctor whose license to practice medicine was revoked by the Board of Medical Examiners had permitted three men who were highly trained anesthesiologists, but who were unlicensed in California, to administer anesthetics under his supervision, direction and control. The Supreme Court held that in so acting, Dr. Magit violated the law and was guilty of unprofessional conduct. However, the court noted that prior to so acting, Dr. Magit had requested professional legal advice as to the propriety of such conduct, and that the legal advice which he received was favorable to the use of the unlicensed men. The court noted that the law on the matter was unclear, unsettled and uncertain and that Dr. Magit acted in "utmost good faith" (p. 88), and immediately halted the use of the unlicensed men when the Medical Board indicated that it was not proper. Under these circumstances, the Supreme Court held that the severe penalty of revocation was a clear abuse

of discretion on the part of the Board of Medical Examiners.

In *Harris,* the Department of Alcoholic Beverage Control had revoked the licensee's on-sale beer and wine license on the basis of the following violations charged to the licensee: use of a minor to serve beer; use of a female, not the licensee's wife, to dispense wine from behind the bar (two separate counts); serving beer to an obviously intoxicated person; and possession of distilled spirits on the premise which was licensed for beer and wine only. These violations had occurred within an eight-day period. In holding that the Department of Alcoholic Beverage Control abused its discretion in revoking the licensee's license for each of these violations separately and singly, the Supreme Court stated as follows: ''Belfiore had no prior disciplinary record with the Department. For almost five years, from 1956 when he obtained a license until the instant proceeding in 1961, he had not been in any difficulties with the Department. Although within an eight-day period several acts were committed that were improper, they were not of such a nature as to warrant revocation of his license. It does not appear that Belfiore regularly employed a minor to act as a bartender but rather that his son volunteered his services on the night in question and filled a few pitchers with beer which he served. The son served the beer to minors, but the Department considered suspension for a limited period of time an adequate penalty for Belfiore's allowing the minors to be served. The fact that a waitress on one occasion served a glass of beer to an intoxicated person and that her acts and knowledge are imputable to the licensee [citation] does not warrant the imposition of the most severe administrative penalty possible, nor do the circumstances surrounding the service of wine to the investigators show that the offenses were of such a character that revocation was justified. With respect to the creme de menthe, there was no evidence that it was used for any purpose except Belfiore's own personal use.'' (P. 595.)

It should also be noted that in *Harris* the Supreme Court, in determining whether the department acted within the limits of its discretion, was also persuaded to the conclusion reached by the fact that the department had issued a bulletin containing a schedule of penalties which indicated its policy regarding penalties and which contemplated that the schedule might not be followed where aggravating or mitigating circumstances were present.

While, at first blush, it might appear that the Supreme

Court in *Magit* and *Harris* was gravitating towards the rule that a reviewing court is free to exercise its own discretion as to the propriety of the penalty imposed, a close reading of these cases indicates that the Supreme Court determined, in each case, that no reasonable man could conclude that, under the particular circumstances of these cases, the imposition of the most severe administrative penalty possible was justified. In *Harris*, it is clearly indicated that there is no abandonment of the rule that where reasonable minds might differ as to the propriety of the penalty imposed, the administrative body or tribunal acts within the area of its discretion.

The judgment is reversed with directions to the trial court to deny the petition and to discharge the alternative writ.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied April 1, 1966, and the judgment was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied May 4, 1966. Mosk, J., did not participate therein.