[No. B030057. Second Dist., Div. Two. Aug. 4, 1988.]

MICHAEL H. MULLEN, Plaintiff and Appellant, v.
DEPARTMENT OF REAL ESTATE, Defendant and Respondent.

COUNSEL

W. Allan McPhee for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Lawrence P. Scherb II, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**COMPTON, Acting P. J.**—In a disciplinary action, the California State Department of Real Estate (department) charged appellant Michael Mullen, a licensed real estate broker, with violations of various California Code of Regulations provisions arising out of his management of a client's escrow account. The department also alleged that his conduct violated a section of the Business and Professions Code.

Following a hearing, an administrative law court rendered a proposed decision ordering that Mullen's license be revoked. The court, however, stayed the revocation on the condition that Mullen serve a 30-day suspension, accept a restricted license, and reimburse the client $5,500 as partial

compensation for his damages. By order of the Real Estate Commissioner (commissioner), the department adopted the decision. Mullen thereafter petitioned the superior court for a writ of mandate to set the order aside and have the department reinstate his license without restrictions. The trial court denied the petition and entered judgment in favor of the department. This appeal follows. We affirm.

■ "In reviewing the decision of the commissioner, in administrative proceedings [to revoke a real estate license] . . . , the trial court exercises its independent judgment to determine whether the commissioner's findings are supported by the weight of the evidence. [Citations.] [¶] The determinations made by the trial court must be accepted by the Court of Appeal if they are supported by substantial evidence. This court is obligated to consider the evidence in the light most favorable to the commissioner, giving to the judgment the benefit of every reasonable inference and resolving all conflicts in its favor. [Citations.]" (*Small* v. *Smith* (1971) 16 Cal.App.3d 450, 454-455 [94 Cal.Rptr. 136].)

Applying the aforementioned rule of appellate review, the record reveals that in late 1982, Clayton Means placed his two homes on the market for sale. At the time he was unemployed and behind in his mortgage payments. In August 1983, Juan Yuri, a real estate agent employed by Mullen, approached the seller and informed him that the Avila family was ready, willing and able to purchase one of the properties. Means executed a listing agreement with Mullen and opened an escrow account No. H-035 with his firm, ERA-Hoxie Realty. He then entered into a contract to sell to the Avilas for $137,000.

The Avilas deposited a total of $13,000 into the escrow account. They thereafter began to process the necessary loan papers required to obtain financing. One week prior to the date of escrow's closing, the Avilas asked Means if they could immediately occupy the house in order to avoid paying an additional month's rent at their present residence. Means agreed to allow them to take early possession of the unit in exchange for their payment of $1,000, made outside of escrow, which he credited against the purchase price of the house.

Unknown to Means, however, a second appraisal downgraded the value of the property by $7,000. Consequently, the buyers' financial institution refused to fund the loan. The Avilas could not afford to increase their downpayment and vacated the premises without informing Means. When the sale failed to close as scheduled, Means went to Mullen's office. There, Mullen told the seller that the deal was "dead." A heated argument followed with Mullen threatening to call the police. At no time during this

meeting did Means authorize Mullen to cancel the escrow and refund the Avilas their deposit.

Nevertheless, in December 1983, Mullen prepared escrow instructions directing the cancellation of the first account and transferring the buyers' funds into a new account No. H-045. Mullen obtained the signatures of the Avilas but he did not ask Means to execute the instructions. Mullen opened the second account for the purpose of enabling the Avilas to purchase a house from another seller. The parties concluded that sale on March 23, 1984, for which Mullen received a commission in the amount of $5,700.

Means subsequently lodged a complaint with the department. The agency commenced the underlying administrative proceeding, averring that Mullen cancelled escrow account No. H-035 in violation of Regulations Code title 10, section 2950, subdivision (b),[1] and section 2832.1.[2] The accusation further alleged that Mullen's conduct constituted fraud or dishonest dealings within the meaning of Business and Professions Code section 10176, subdivision (i).[3]

In his defense, Mullen testified that Means decided to cancel the escrow once he was informed that the transaction could not be consummated. Mullen's wife, Christine, who also acted as his secretary, testified that on the day Means met with her husband he executed a handwritten cancellation order in her presence. She further stated that she read the document and placed it into a file. However, because the order became lost, she

---

[1] California Code of Regulations title 10, section 2950 provides:
"The following acts in the handling of an escrow by a real estate broker exempted from the provisions of the Escrow Law (by § 17006(d) of the Financial Code) are prohibited and may be considered grounds for disciplinary action: . . . [¶] (b) Permitting any person to make any addition to, deletion from, or alteration of an escrow instruction (or amended or supplemental escrow instruction) received by such licensee, unless such addition, deletion or alteration is signed or initialed by all persons who had signed or initialed such escrow instruction (or amended or supplemental escrow instruction) prior to such addition, deletion or alteration."

[2] Section 2832.1 commands that "[c]ompliance with Section 10145 of the Code requires that a real estate broker not disburse, nor cause or permit the disbursement of, trust funds from a trust fund account without the prior written consent of every principal who is an owner of the funds in the account if the disbursement will reduce the balance of funds in the account to an amount less than the existing aggregate trust fund liability of the broker to all owners of said funds."

[3] Business and Professions Code section 10176, subdivision (i) provides: "The commissioner may, upon his own motion, and shall, upon the verified complaint in writing of any person, investigate the actions of any person engaged in the business or acting in the capacity of a real estate licensee within this state, and he may temporarily suspend or permanently revoke a real estate license at any time where the licensee, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter has been guilty of any of the following: . . . [¶] (i) Any other conduct, whether of the same or a different character than specified in this section, which constitutes fraud or dishonest dealing."

testified that she was unable to produce the paper for the hearing. Mullen's salesman, Yuri, who was also at the meeting, testified that he too witnessed Means execute the cancellation order.

In its decision, the administrative court expressly rejected the assertion that Means signed a written cancellation of the escrow instructions. The court stated: "[T]he office simply did not receive cancellation instructions which were signed by all parties. . . . All parties did not sign the same cancellation instruction even under [Mullen's] version. It should also be noted that Mr. Yuri did describe his efforts to locate Mr. Means so that the escrow instructions might be signed by Mr. Means. This conduct is somewhat inconsistent with [Mullen's] contention that he possessed handwritten instructions from Mr. Means directing him to cancel the escrow. It is finally noted that [Mullen] lost all interest in attempting to sell the Means residence when it was learned that the final appraisal was lower than expected. Mr. Means had signed an exclusive listing agreement with [Mullen] and that exclusive listing agreement was still in full force and effect. [Mullen] made no further effort to sell the residence of Mr. Means, nor did [Mullen] make any effort to further negotiate the transaction assuming that some adjustment in price might be necessary by virtue of the reduced appraisal. [Mullen] made no effort in this regard. [Mullen] is in breach of his contractual and professional obligations both as a real estate broker and as an escrow agent."

In its judgment, the superior court stated that "all of the findings of, and the penalty imposed by, [the department] are supported in full by the weight of the evidence in the record, using the independent judgment test; further, that the monetary sanction imposed on petitioner by [the department] pursuant to Government Code section 11519(d) as restitution to petitioner's client was proper, authorized by section 11519(d) and constitutional; and further that the determination of the credibility of the witnesses is within the province of the [department] and that [the department] properly exercised its discretion in said determination; therefore no grounds exist for granting a petition for mandate relief under Code of Civil Procedure section 1094.5. . . ."

■■ On appeal, Mullen first contends that the superior court erred when it found that the administrative record supported the conclusion that Means never authorized the cancellation of the escrow. We disagree. At the administrative proceeding, Means unequivocally denied that he gave Mullen or Yuri permission to release the escrow deposit. Unable to proffer a cancellation order signed by the seller, Mullen's defense was limited to the testimony of his witnesses who stated they saw Means execute the instruction. ■■ As we stated in *Campbell* v. *Board of Dental Examiners* (1971)

17 Cal.App.3d 872, 876 [95 Cal.Rptr. 351], the determination of the credibility of witnesses in an administrative proceeding is within the province of the hearing officer.

In a belated attempt to impeach the seller's testimony, Mullen has requested this court for leave to produce what he claims is newly discovered evidence, to wit: Means's verified declaration admitting he perjured himself at the administrative proceeding when he testified that he did not sign an instruction to disburse the escrow funds. Having fully considered the issue, we deny Mullen's request on the ground that the proffered declaration is evidence of intrinsic fraud, and as such, is incompetent to challenge the judgment.

"A direct attack on an otherwise final, valid judgment by way of an independent action to set it aside [citations] is permitted where it appears that the complaining party was fraudulently prevented from presenting his claim or defense in the prior action." (*Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 632 [99 Cal.Rptr. 393].) This is known as extrinsic fraud. The rule is premised on the "important public policy that litigants be afforded a fair adversary proceeding in which fully to present their case. [Citation.]" (*Ibid.*) An example of extrinsic fraud occurs when an unsuccessful party is kept from appearing in the action by a false promise of a compromise. (*Id.* at p. 633.)

However, where the fraud was committed within the trial there can be no relief. "[I]t is settled beyond controversy that a decree will not be vacated merely because it was obtained by forged documents or perjured testimony. The reason of this rule is, that there must be an end of litigation; and when parties have once submitted a matter, or have had the opportunity of submitting it, for investigation and determination, and when they have exhausted every means for reviewing such determination in the same proceeding, it must be regarded as final and conclusive, unless it can be shown that the jurisdiction of the court has been imposed upon, or that the prevailing party, by some extrinsic or collateral fraud, has prevented a fair submission of the controversy." (22 Cal.App.3d at p. 633.)

As in the instant case, where the judgment is not yet final, but the period to make a motion for a new trial has expired, there is authority recognizing that an appellate court can issue a writ of *coram vobis* to command a trial court to reconsider its decision in light of evidence discovered during the pendency of an appeal. (See *Rollins* v. *City and County of San Francisco* (1974) 37 Cal.App.3d 145 [112 Cal.Rptr. 168].) However, as discussed, *ante,* evidence of Means's alleged perjury amounts to intrinsic fraud and therefore is insufficient to grant Mullen the requested relief. (*Los Angeles*

*Airways, Inc.* v. *Hughes Tool Co.* (1979) 95 Cal.App.3d 1 [156 Cal.Rptr. 805].)[4]

■    Mullen's final contention is that the superior court erred by not ordering the commissioner to reconsider the penalty recommended by the administrative court.    ■    "It is well settled that in a mandamus proceeding to review an administrative order the determination of penalty by the administrative body will not be disturbed unless there is a clear abuse of discretion. [Citations.]" (*Brown* v. *Gordon* (1966) 240 Cal.App.2d 659, 666 [49 Cal.Rptr. 901].)    ■    We find no such abuse. Mullen dealt dishonestly and betrayed a trust when he disbursed the deposit money of escrow account No. H-035 without Means's authorization. Therefore, revocation of his license would be proper. (See Bus. & Prof. Code, § 10176, subd. (i).) Mullen should not complain that the commissioner instead chose to exercise leniency and place him on probation on the condition that he disgorge the commission he earned on the subsequent sale.[5] As we see it, this condition complied with the spirit of Government Code section 11519, subdivision (d),[6] providing that the terms of probation "may include an order of restitution . . . to compensate the other party or parties to a contract damaged as a result of a breach of contract. . . ."[7]

---

[4] The *Los Angeles Airways* court was highly critical of the *Rollins* decision. The court stated: "A rule permitting the criteria for a new trial to govern a case where the evidence is discovered later, has no basis in the statutes or in any other case. It would extend the time for a motion for a new trial by pure judicial fiat. Such an extension not only is beyond our power to create but there is good reason to limit the time within which a new trial may be requested: the fresher in memory are the events of the trial, the more rationally may the trial court exercise the broad discretion it has under Code of Civil Procedure section 657 to grant a new trial. That discretion depends on multiple factual considerations. Many of those considerations depend on actual perceptions throughout the trial which are not preserved on the cold record. Accordingly, there is good reason to limit the time within which such broad discretion may be exercised, and to apply the stricter doctrines of extrinsic fraud which favor finality once we go beyond that limited time. The Legislature has in fact set such limit. We should not ignore it." (95 Cal.App.3d at pp. 9-10.)

[5] Government Code section 11519, subdivision (b) provides that in an administrative adjudication "[a] stay of execution may be included in the decision or if not included therein may be granted by the agency at any time before the decision becomes effective. The stay of execution provided herein may be accompanied by an express condition that respondent comply with specified terms of probation; provided, however, that the terms of probation shall be just and reasonable in the light of the findings and decision."

[6] Government Code section 11519, subdivision (d) provides in full: "As used in subdivision (b), specified terms of probation may include an order of restitution which requires the party or parties to a contract against whom the decision is rendered to compensate the other party or parties to a contract damaged as a result of a breach of contract by the party against whom the decision is rendered. In such case, the decision shall include findings that a breach of contract has occurred and shall specify the amount of actual damages sustained as a result of such breach. Where restitution is ordered and paid pursuant to the provisions of this subdivision, such amount paid shall be credited to any subsequent judgment in a civil action based on the same breach of contract."

[7] The administrative court stayed the revocation of Mullen's license on the condition that he pay "to Clayton Means the sum of $5,500, a figure which is the commission which respon-

The judgment is affirmed.

Gates, J., and Fukuto, J., concurred.

---

dent received in the Avila transaction less the $200 which [Mullen] did personally advance to Mr. Means. With respect to this sum it is recognized that this figure is probably not full compensation for the damages which may have been suffered by Mr. Means. However, the aspect of damages has not been fully covered in this proceeding and there may be a civil matter where damages will be more carefully explored. It is apparent, however, that Mr. Means did suffer substantial injury as a result of the misconduct of [Mullen]. The order imposed herein is only to insure that respondent does not receive a commission by virtue of his shortcomings toward Mr. Means. It is hoped, however, that the sum paid by respondent would be considered as partial restitution in any civil proceeding between Mr. Means and [Mullen.]"