Filed 8/3/15; pub. order 8/27/15 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KAREN D. NOSAL-TABOR, | D065843 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00042433-CU-WT-CTL) |
| SHARP CHULA VISTA MEDICAL CENTER, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, John Meyer, Judge. Reversed.

David A. Miller for Plaintiff and Appellant.

Andrews Lagasse Branch & Bell, Margaret Chandler Bell and Shauna L. Sinnott, for Defendant and Respondent.

I.

INTRODUCTION

The Nursing Practice Act (Bus. & Prof. Code, § 2700 et seq.) regulates the practice of nursing in California. The Nursing Practice Act permits nurses to perform certain functions that would otherwise be considered the illegal practice of medicine, when such functions are performed pursuant to a hospital's "standardized procedures." (Bus. & Prof. Code, § 2725, subd. (c).) The Nursing Practice Act further provides that the content of such standardized procedures shall be governed by guidelines promulgated by the Board of Registered Nursing and the Medical Board of California. (*Ibid*.; see Cal. Code Regs., tit. 16, § 1470-1474, hereafter "Guidelines.")

Karen Nosal-Tabor is a registered nurse who previously worked in the cardiology department at Sharp Chula Vista Medical Center (Sharp). A significant portion of Nosal-Tabor's job duties involved assisting with cardiac stress tests—a diagnostic test used to gather information concerning how well a patient's heart is working when placed under physical or chemical stressors. In 2011, Sharp implemented "nurse-led" cardiac stress testing in which a physician is not physically present during the tests. Nosal-Tabor repeatedly refused to perform nurse-led stress tests and made numerous complaints concerning the testing to Sharp's management. Among Nosal-Tabor's complaints was that stress testing constitutes the practice of medicine and that Sharp had not adopted legally adequate standardized procedures to permit its nurses to perform such tests.

2

Sharp's management told Nosal-Tabor that Sharp had adopted legally sufficient standardized procedures, and that these procedures permitted nurses such as Nosal-Tabor to conduct nurse-led stress testing. After Nosal-Tabor continued to refuse to perform nurse-led stress testing and to complain about its implementation, Sharp disciplined her and eventually terminated her employment.

Nosal-Tabor sued Sharp,[1] alleging wrongful termination and two causes of action premised on claims of improper workplace retaliation. Sharp filed a motion for summary judgment. The trial court granted the motion, ruling that Nosal-Tabor presented "no credible evidence that the Standardized Procedures in place at the time of her termination were insufficient."

On appeal, Nosal-Tabor claims that the trial court erred in granting Sharp's motion for summary judgment. Her primary contention is that the trial court erred in concluding that there was no evidence upon which a reasonable juror could find that Sharp had failed to adopt standardized procedures that comply with the Guidelines. Nosal-Tabor contends that this error caused the court to improperly conclude that she would be unable to establish any of her causes of action.

We conclude that the trial court erred in granting summary judgment for Sharp. The documents that Sharp maintains constitute its standardized procedures do not contain several elements that are required by the Guidelines. In light of these deficiencies, a

---

[1]     Sharp answered Nosal-Tabor's complaint, and noted that it had erroneously been named as "Sharp HealthCare" in the complaint.

reasonable juror could find that Sharp improperly retaliated against, and wrongfully terminated, Nosal-Tabor when she complained about, and refused to perform, nurse-led stress testing pursuant to Sharp's legally deficient procedures.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Nosal-Tabor's complaint*

Nosal-Tabor filed a complaint against Sharp in April 2013 in which she alleged that she had made numerous complaints to Sharp's management concerning the "illegal procedures for stress testing of . . . cardiac patients."  Among her complaints was "the lack of a legally required Standardized Procedure" authorizing the performance of nurse-led stress testing.  Nosal-Tabor alleged that she had "confirmed with her licensing agency that such testing was unsafe," and claimed that the licensing agency had "warned [her] to stop doing it in the manner Sharp demanded."

Nosal-Tabor also alleged that she made a formal complaint to a Sharp compliance hotline in October 2011, and that she was "written up the following week."  In addition, Nosal-Tabor alleged that in February 2012, she was given a poor performance review and was suspended without pay for several days in retaliation for her complaints.  Nosal-Tabor further alleged that in April 2012, Sharp terminated her employment after she refused to perform "an unsafe cardiac test."

In a claim for wrongful termination in violation of public policy, Nosal-Tabor claimed that Sharp's termination of her employment violated the public policies

4

embodied in Health and Safety Code section 1278.5, former Labor Code section 1102.5,[2] Business and Professions Code section 2725, and California Code of Regulations, title 16, sections 1379 and 1470 through 1474.[3]

Nosal-Tabor also brought a direct claim for a violation of Labor Code section 1102.5, in which she alleged that she was discharged in retaliation for "active opposition to unlawful company practices and policies," and a direct claim for violation of Health and Safety Code section 1278.5 in which she alleged that Sharp had retaliated against her for making the complaints described above.

B.      *Sharp's motion for summary judgment*

Sharp filed a motion for summary judgment or summary adjudication in December 2013. The gist of Sharp's motion was that Nosal-Tabor would be unable to establish any of her causes of action because the basis for her termination was "her refusal to perform her *lawful* job duties as directed." (Italics added.) In support of this contention, Sharp maintained that the procedures that it had adopted to perform nurse-led

---

[2]      After Nosal-Tabor filed her complaint, the Legislature amended former Labor Code section 1102.5. (Stats. 2013, ch. 781, § 4.1.) All subsequent statutory references to Labor Code section 1102.5 are to the prior version of the statute. (Stats. 2003, ch. 484, § 2.)

[3]      Health and Safety Code section 1278.5 prohibits retaliation against health care workers for making complaints concerning patient safety. Labor Code section 1102.5, subdivision (c) prohibits retaliating against an employee for refusing to participate in an activity that would result in a violation of state or federal law. Business and Professions Code section 2725, and California Code of Regulations, title 16, sections 1379 and 1470 through 1474 pertain to the scope of practice of nursing and/or the development of standardized procedures.

5

stress testing were lawful and that it had provided Nosal-Tabor with "overwhelming confirmation . . . of the legality of nurse-led stress testing." With respect to each cause of action, Sharp contended that, in light of the legality of nurse-led stress-testing at Sharp, Nosal-Tabor's refusal to perform such testing and/or her complaints concerning such testing were unreasonable.[4]

Sharp supported its motion with numerous documents, including copies of its procedures for performing nurse-led stress testing. In addition, Sharp lodged a declaration from Dr. Daniel Cepin. Dr. Cepin is a practicing cardiologist and has been the Medical Director of Cardiology Services at Sharp since 2006. Dr. Cepin stated that, prior to 2011, Sharp required a physician to be present during cardiac stress testing. In 2010, after the Center for Medicare and Medicaid Services changed federal regulations governing the payment for certain outpatient diagnostic services, Sharp began to develop standardized procedures to allow nurses to perform stress testing without a physician being physically present.

Dr. Cepin authenticated the documents that Sharp offered outlining its nurse-led stress testing procedures and explained the manner by which the procedures had been adopted as follows:

> "I am a member of [Sharp's] CardiologyAdvisory Committee. In or
> around October 2011, the Cardiology Advisory Committee reviewed
> and approved the standardized procedures for nurse-led stress

---

[4]  Sharp also contended that Nosal-Tabor's claim for a violation of Labor Code section 1102.5 was barred by her failure to exhaust administrative remedies with the Labor Commissioner.

testing. Attached to the NOL [Notice of Lodgment] as Exhibit 8 are the Department Guidelines approved by the Cardiology Advisory Committee. Attached to the NOL as Exhibit 11 is the Stress Test Standard Order Set approved by the Cardiology Advisory Committee. In or around November 2011, the Cardiology Advisory Committee reviewed and approved the cardiac stress testing protocol, which is attached to the NOL as Exhibit 9. In or around January 2012, the Cardiology Advisory Committee reviewed and approved the Treadmill Testing guidelines, which are attached to the NOL as Exhibit 10."

Dr. Cepin stated that in his opinion, Sharp's procedures were legally adequate:

"I have reviewed California Code of Regulations section 70706.2 [Cal. Code. Regs., tit. 22, § 70706.2[5]] and am familiar with the standardized procedure guidelines promulgated by the Medical Board of California and the Board of Registered Nursing, which are attached to the NOL as Exhibit 13.[6] It is my opinion that the Sharp Chula Vista Medical Center's Department Guidelines coupled with the Standard Order Set meet guidelines for standardized procedures for nurse-led stress testing."

---

[5] California Code of Regulations, title 22, section 70706.2 is contained within administrative regulations governing hospitals regulated by the Department of Health Services. The regulation provides that a "Committee on Interdisciplinary Practice" shall be responsible for adopting standardized procedures as defined in Business and Professions Code section 2725 at hospitals. California Code of Regulations, title 22, section 70706.2 outlines, without material differences, the same 11 requirements for standardized procedures as specified in the Guidelines.

[6] Exhibit 13 is California Code of Regulations, title 22, section 70706.2. While Dr. Cepin suggested in his declaration that California Code of Regulations, title 22, section 70706.2 had been adopted by the Medical Board of California and the Board of Registered Nursing, the regulation was adopted by the Department of Health Services. (See fn. 5., *ante*.) However, as explained in footnote 5, *ante*, California Code of Regulations, title 22, section 70706.2 outlines, without material distinction, the same required contents for standardized procedures as are outlined in the Guidelines.

C.    *Nosal-Tabor's opposition*

Nosal-Tabor filed an opposition in which she contended both that the procedures adopted by Sharp to authorize nurse-led stress testing did not comply with the 11 specific requirements established in the Guidelines, and that she had repeatedly complained to Sharp's management concerning this issue.  She argued in part:

> "[Nosal-Tabor] constantly insisted that Sharp must write up a Standardized Procedure before any nurse can conduct a nurse-led cardiac stress test.  She specifically protested the lack of a Standardized Procedure throughout 2010—until she was terminated. [¶]  In 2010, Sharp first created a document called a 'Department Guideline,' and tried to claim it was a Standardized Procedure.  It was not.  The 'Department Guideline' does not match the legal requirements stated by the [Board of Registered Nursing] in their website where they refer to the laws and regulations governing a written Standardized Procedure."

Nosal-Tabor noted that she had complained to the Board of Registered Nursing concerning Sharp's nurse-led stress testing procedures and that the Board had "warned her that . . . she and her colleagues could be subjected to discipline if she performed nurse-led cardiac stress testing without a Standardized Procedure written in accordance with the laws and regulations governing nurses."  Nosal-Tabor further argued that she had been both disciplined and terminated for refusing to perform, and complaining about, unlawful nurse-led stress testing.

As to her specific causes of action, Nosal-Tabor contended that there was a triable issue of material fact with respect to her claim for wrongful termination in violation of public policy because she was fired for "oppos[ing] the illegal failure of Sharp to have a

8

correct Standardized Procedure in place." Nosal-Tabor also claimed that she had established a triable issue of fact with respect to whether Sharp had violated Labor Code section 1102.5 and argued that she was not required to have exhausted any administrative remedies with the Labor Commissioner prior to filing a lawsuit for a violation of Labor Code section 1102.5. With respect to her claim for violation of Health and Safety Code section 1278.5, Nosal-Tabor maintained that she had repeatedly complained about the adequacy of Sharp's nurse-led stress testing procedures, and that she had suffered "extreme adverse employment actions promptly after making her reports."

Among the documents that Nosal-Tabor offered in support of her opposition was an e-mail from an employee of the Board of Registered Nursing to Nosal-Tabor that stated in relevant part:

> "[S]tress testing is outside the scope of practice for nurses, and those who do supervise cardiac stress testing and act on the results, are practicing medicine[.] [I]n order for [registered nurses] to do this, they must develop standardized procedures within the organized health care system, pursuant to [California Code of Regulations, title 16, section] 1474. Once these [standardized procedures] are developed and properly approved, [registered nurses] may participate in stress testing per the established guidelines."

Nosal-Tabor also offered her own declaration outlining the employment discipline that she received for her refusal to participate in nurse-led stress testing and her "protest[s] [concerning] the lack of a Standardized Procedure," and lodged documents demonstrating the many complaints she made to Sharp's management concerning the practice.

9

Nosal-Tabor also offered an excerpt of the deposition testimony of Sherrie Navedo, Sharp's Director of Critical Care. During the deposition, Navedo explained that she was familiar with the meaning of the term "standardized procedure," stating, "We do standardized procedures all through the hospital." Nosal-Tabor's counsel then asked Navedo whether Sharp had a standardized procedure in place for nurses to do nurse-led stress testing during the time period when Nosal-Tabor was employed. Navedo responded, "I believe not." Navedo explained, "It was a departmental procedure instead of a standardized procedure."

In addition, Nosal-Tabor offered an excerpt of the deposition of Dr. Cepin that included the following colloquy:

> "[Nosal-Tabor's counsel]: And is it your testimony, then, that this [referring to documents outlining Sharp's procedures for conducting nurse-led stress testing] meets the requirements for a standardized procedure?

> "[Dr. Cepin]: "I don't know whether it meets the requirements for a standardized procedure, but it—basically it gives you the guidelines."

D. *The trial court's ruling*

After Sharp filed a reply and the trial court held a hearing, the court granted Sharp's motion for summary judgment. In its order granting Sharp's motion, the court began its analysis by addressing Nosal-Tabor's claims for retaliation in violation of Labor Code section 1102.5 and Health and Safety Code section 1278.5. After outlining the required elements of each statute, the court ruled that Sharp had established, as a matter

10

of law, a legitimate nonretaliatory reason for its actions, namely, Nosal-Tabor's refusal to perform nurse-led stress testing. In so ruling, the trial court indicated that there was no evidence from which a reasonable juror could find that Sharp had failed to adopt standardized procedures that complied with the Guidelines. The court reasoned in part:

> "According to [Nosal-Tabor], the reason she was terminated was because she refused to perform nurse-testing without a Standardized Procedure in place as required by the Board of Registered Nursing. [¶] This may have raised a triable issue of fact if [Nosal-Tabor] was terminated in 2011. However, at the time plaintiff was terminated in April 2012, there were Standardized Procedures in place."

The court also ruled that Sharp had adopted procedures for performing nurse-led stress testing that constituted legally sufficient standardized procedures under the Guidelines. In support of this conclusion, the trial court quoted Dr. Cepin's declaration. In addition, the court concluded that Nosal-Tabor had presented "no credible evidence that the Standardized Procedures in place at the time of her termination were insufficient." Accordingly, the trial court ruled that Nosal-Tabor had failed to present any evidence to support her claim that Sharp had taken an adverse employment action against her for an improper reason.[7]

The trial court also ruled that Sharp was entitled to judgment as a matter of law on Nosal-Tabor's Labor Code section 1102.5 claim on the additional ground that she had failed to exhaust administrative remedies with the Labor Commissioner.

---

[7] Although in its analysis, the trial court referred solely to Sharp's *termination* of Nosal-Tabor's employment, by implication, the trial court ruled that Sharp had not taken *any* improper adverse employment action against Nosal-Tabor.

11

In addressing Nosal-Tabor's claim for wrongful termination in violation of public policy, the court noted that Nosal-Tabor alleged that her termination violated the public policies embedded in Labor Code section 1102.5, Health and Safety Code section 1278.5, Business and Professions Code section 2725, and California Code of Regulations, title 16, sections 1379 and 1470 through1474. The court ruled that Nosal-Tabor could not establish that her termination violated the public policies embedded in Labor Code section 1102.5 and Health and Safety Code section 1278.5 for the reasons set forth above. With respect to Business and Professions Code section 2725, and California Code of Regulations, title 16, sections1379 and 1470 through 1474, the court ruled:

> "There is no public policy stated in the statute and regulations. They merely adopt the requirement for Standardized Procedures. As discussed above, at the time plaintiff was terminated, there were Standardized Procedures in place."

The trial court subsequently entered a judgment in favor of Sharp.

E.    *Nosal-Tabor's appeal*

Nosal-Tabor timely appeals from the judgment.

III.

DISCUSSION

*The trial court erred in granting Sharp's motion for summary judgment*

Nosal-Tabor claims that the trial court erred in granting Sharp's motion for summary judgment. She argues that the record contains evidence demonstrating the existence of a triable issue of material fact with respect to each of her three causes of

12

action: wrongful termination in violation of public policy; violation of Labor Code section 1102.5; and violation of Health and Safety Code section 1278.5.

A.     *Applicable principles of law governing motions for summary judgment and the standard of review*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action.  (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.  [Citations.]'  [Citation.]"  (*Trop v. Sony Pictures Entertainment, Inc*. (2005) 129 Cal.App.4th 1133, 1143.)

B.     *The trial court erred in granting judgment as a matter of law for Sharp on Nosal-Tabor's wrongful termination in violation of public policy*

Nosal-Tabor claims that the trial court erred in granting judgment as a matter of law for Sharp on her claim for wrongful termination in violation of public policy.

1.      *Governing law*

     a.      *Wrongful termination in violation of public policy*

"The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm."  (*Yau v. Allen* (2014) 229 Cal.App.4th 144, 154.)  It is well established that a termination premised on an employee's refusal to violate either a statute or an administrative regulation may support a claim for wrongful termination in violation of public policy.  (See *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090 [statutes]; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80 [administrative regulations].)

     b.      *The Nursing Practice Act*

Business and Professions Code section 2725, subdivision (b), a provision in the Nursing Practice Act, defines the practice of nursing in relevant part as follows:

> "The practice of nursing within the meaning of this chapter means those functions, including basic health care, that help people cope with difficulties in daily living that are associated with their actual or potential health or illness problems or the treatment thereof, and that require a substantial amount of scientific knowledge or technical skill, including all of the following:
>
> "(1) Direct and indirect patient care services that ensure the safety, comfort, personal hygiene, and protection of patients; and the performance of disease prevention and restorative measures.
>
> "(2) Direct and indirect patient care services . . . .

14

"(3) The performance of skin tests, immunization techniques, and the withdrawal of human blood from veins and arteries.

"(4) Observation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and (A) determination of whether the signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics, and (B) implementation, based on observed abnormalities, of appropriate reporting, or referral, or standardized procedures, or changes in treatment regimen in accordance with standardized procedures, or the initiation of emergency procedures."

"Section 2725 of the Nursing Practice Act was amended during the 1973-1974 legislative session of the California Legislature to expand the scope of practice for nurses. It emphasizes that 'nursing is a dynamic field, the practice of which is *continually evolving to include more sophisticated patient care activities.*' ([Bus. & Prof. Code,] § 2725, subd. (a), italics added.) The Legislature enacted into law its 'intent . . . to provide *clear legal authority* for functions and procedures that have common acceptance and usage,' and to 'permit additional sharing of functions within organized health care systems' of '*overlapping functions* between physicians and registered nurses.' (*Ibid.,* italics added)." (*California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 402.) To that end, Business and Professions Code section 2725 permits nurses to perform certain functions that would otherwise be considered the practice of medicine, when such functions are performed pursuant to properly adopted "standardized procedures." (*Id*., subd. (c).) The statute further provides that standardized procedures shall be adopted pursuant to guidelines promulgated by the Board of Registered Nursing and the Medical Board of California. (*Ibid*; see also Bus. & Prof. Code, § 2726 ["Except

15

as otherwise provided herein, this chapter confers no authority to practice medicine or surgery"].)[8]

      c.     *The Guidelines*

California Code of Regulations, title 16, section 1470 outlines the purpose of the Guidelines as follows:

> "The Board of Registered Nursing in conjunction with the Medical Board of California . . . intends, by adopting the regulations contained in the article, to jointly promulgate guidelines for the development of standardized procedures to be used in organized health care systems which are subject to this rule.[9] The purpose of these guidelines is:
>
> "(a) To protect consumers by providing evidence that the nurse meets all requirements to practice safely.
>
> "(b) To provide uniformity in development of standardized procedures."

California Code of Regulations, title 16, section 1472 specifies that hospitals "must develop standardized procedures before permitting registered nurses to perform standardized procedure functions." The regulation further provides that "[a] registered nurse may perform standardized procedure functions only under the conditions specified

---

8      Business and Professions Code section 2051 defines the practice of medicine by authorizing physicians "to use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions."
      Business and Professions Code section 2052 makes it a crime for an unlicensed person to practice medicine, including "diagnos[ing] . . . any ailment."

9      It is undisputed that Sharp is such an entity.

in a health care system's standardized procedures; and must provide the system with satisfactory evidence that the nurse meets its experience, training, and/or education requirements to perform such functions."

California Code of Regulations, title 16, section 1474 outlines the required contents of all standardized procedures as follows:

"Following are the standardized procedure guidelines jointly promulgated by the Medical Board of California and by the Board of Registered Nursing:

"(a) Standardized procedures shall include a written description of the method used in developing and approving them and any revision thereof.

"(b) Each standardized procedure shall:

"(1) Be in writing, dated and signed by the organized health care system personnel authorized to approve it.

"(2) Specify which standardized procedure functions registered nurses may perform and under what circumstances.

"(3) State any specific requirements which are to be followed by registered nurses in performing particular standardized procedure functions.

"(4) Specify any experience, training, and/or education requirements for performance of standardized procedure functions.

"(5) Establish a method for initial and continuing evaluation of the competence of those registered nurses authorized to perform standardized procedure functions.

"(6) Provide for a method of maintaining a written record of those persons authorized to perform standardized procedure functions.

17

"(7) Specify the scope of supervision required for performance of standardized procedure functions, for example, immediate supervision by a physician.

"(8) Set forth any specialized circumstances under which the registered nurse is to immediately communicate with a patient's physician concerning the patient's condition.

"(9) State the limitations on settings, if any, in which standardized procedure functions may be performed.

"(10) Specify patient record keeping requirements.

"(11) Provide for a method of periodic review of the standardized procedures."[10]

        d.     *Labor Code section 1102.5, subdivision (c)*

Labor Code section 1102.5, subdivision (c) provides:

"An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

        2.     *Application*

Nosal-Tabor contends that the trial court erred in concluding that she would be unable to prove that her termination was substantially motivated by a violation of public policy, and thus, that Sharp was entitled to judgment as a matter of law on her wrongful termination claim. Sharp maintains that the trial court properly concluded that Nosal-Tabor would not be able to establish this element of her claim because the undisputed

---

[10]    In her wrongful termination cause of action, Nosal-Tabor also cited California Code of Regulations, title 16, section 1379, which provides that physicians and surgeons who collaborate in the development of standardized procedures for registered nurses shall comply with the Guidelines.

evidence established that Sharp terminated her for a legitimate business reason, namely, her failure to perform her "*lawful* job duties." (Italics added.)[11]

At the outset, we reject the trial court's conclusion that there is "no public policy stated" in Business and Professions Code section 2725 and the Guidelines that may support a claim for wrongful termination. A discharge is actionable as against public policy if it violates a policy that is: " '(1) delineated in either constitutional or statutory provisions; (2) "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) "substantial" and "fundamental." ' [Citation.]" (*Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 929.) "Whether the policy upon which a wrongful termination claim is based is sufficiently fundamental, well established and tethered to a statutory or constitutional provision to support liability is a legal question that we review de novo." (*Ibid*.)

Business and Professions Code section 2725 and the Guidelines have long defined the legal scope of nursing. In addition, they are part of a larger scheme of licensing statutes and regulations that govern the practice of medicine and nursing, whose purpose

---

11  The trial court's order granting summary judgment was based entirely on the ground that Sharp established a legitimate business reason for her termination, and Sharp does not contend that it demonstrated an absence of a triable issue of fact with respect to any of the remaining elements of Nosal-Tabor's claim. Accordingly, we restrict our analysis to the only element at issue, namely, whether Sharp was entitled to summary judgment on the ground that there was no triable issue of material fact with respect to whether Nosal-Tabor's termination was substantially motivated by a violation of public policy.

is to protect the public. (See *Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 85 [stating that "our statutory system . . . , in order to assure the protection of the public, requires that a person's competency be determined by the state and evidenced by a license"].) Further, criminal sanctions may be imposed upon those who fail to practice nursing within the scope of his or her license. (See, e.g., Bus. & Prof. Code, § 2732 ["No person shall engage in the practice of nursing, as defined in [Business and Professions Code] Section 2725, without holding a license which is in an active status issued under this chapter except as otherwise provided in this act"]; Bus. & Prof. Code, § 2052 [making it a crime for unlicensed person to practice medicine, including "diagnos[ing] . . . any ailment"].) "In a number of cases, the prospect of criminal sanctions to punish the violation of a policy has been a significant factor in the determination that a policy is substantial and fundamental," and thus supportive of a claim for wrongful discharge. (See *Sullivan v. Delta Air Lines, Inc.* (1997) 58 Cal.App.4th 938, 945, fn. 6.) In addition, Labor Code section 1102.5, subdivision (c) precludes employers from retaliating against an employee for refusing to participate in activities that would result in a violation of a state statute or regulation. In light of this statutory and regulatory framework, we conclude that Nosal-Tabor adequately identified a fundamental public policy on which to base her wrongful termination claim by claiming that her employment was terminated for refusing to perform acts that were unlawful under Business and Professions Code section 2725 and the Guidelines. Thus, we must determine whether there is evidence in the record sufficient to support a finding that Nosal-Tabor was terminated for refusing to

20

perform acts that were not lawful under Business and Professions Code section 2725 and the Guidelines.

On appeal, Sharp does not dispute that nurses performing nurse-led cardiac stress testing are required to conduct such testing pursuant to properly adopted standardized procedures pursuant to Business and Professions Code section 2725 and the Guidelines. However, Sharp contends that it "maintained the appropriate standardized procedures to allow a cardiac registered nurse to perform nurse-led stress testing . . . ." We disagree.

As noted previously, in its motion for summary judgment, Sharp offered four documents that it contended constitute lawful standardized procedures under the Guidelines. The documents are entitled "RN [Registered Nurse] Administered Cardiac Stress Testing Guidelines," "Cardiac Stress Testing Protocol," Treadmill Testing Guidelines," and "Stress Test Standard Order Set."[12] (See part II.B, *ante*.) After a careful review of the documents, we observe that they fail to include several elements that the Guidelines mandate be included in a standardized procedure. Specifically, Sharp's procedures do not include "a method for initial and continuing evaluation of the competence of those registered nurses authorized to perform standardized procedure functions." (Cal. Code Regs., tit. 16, § 1474, subd. (b)(5).) This is a significant deficiency, because the requirement relates directly to the need to have procedures that ensure that a nurse is currently competent to perform the standardized procedure function. In addition, Sharp's procedures do not contain a "method of maintaining a

---

[12] Collectively, we refer to these documents as "Sharp's procedures."

written record of those persons authorized to perform standardized procedure functions." (*Id*., subd. (b)(6).) Finally, Sharp's procedures do not "provide for a method of periodic review . . . ." (*Id*., subd. (b)(11).) Given that Sharp's procedures, on their face, fail to include more than a quarter of the mandated components that are to be included in all standardized procedures, no reasonable juror could find that Sharp adopted standardized procedures that comply with the Guidelines.

Sharp's arguments to the contrary are not persuasive. First, Sharp contends that Nosal-Tabor failed to provide expert testimony to counter Dr. Cepin's opinion that Sharp's procedures complied with the Guidelines. We reject this argument for two reasons. Most importantly, whether Sharp's procedures comply with the legal requirements contained in the Guidelines is not a matter subject to expert medical testimony. Thus, Nosal-Tabor was not required to present expert testimony to counter Dr. Cepin's statement in his declaration that, in his opinion, Sharp's procedures complied with the Guidelines. In addition, Nosal-Tabor presented an excerpt of Dr. Cepin's deposition testimony in which he admitted that he "[did not] know" whether Sharp's procedures met "the requirements for a standardized procedure." Nosal-Tabor also presented the deposition testimony of Sharp's Director of Critical Care who stated that she did not believe that Sharp had adopted standardized procedures authorizing nurse-led stress testing. Thus, Sharp is not entitled to summary judgment on the ground that undisputed expert testimony established that Sharp had adopted standardized procedures that complied with the Guidelines.

22

Sharp also contends that the legality of its procedures is established by evidence that the Joint Commission[13] and the California Department of Public Health "investigated Nosal-Tabor's complaints about nurse-led stress testing and found no violations or improper conduct." We reject this contention because the record does not contain any evidence as to the basis upon which these entities rejected Nosal-Tabor's complaints. Thus, even assuming that it would be proper for the trial court to defer to these entities' interpretations as to whether Sharp's procedures for nurse-led stress testing complied with the Guidelines, a point on which we express no opinion, there is nothing in the record explaining the reasoning of either entity upon which the court could reasonably base such deference.[14]

We also reject Sharp's contention that three publications from the Centers for Medicare and Medicaid Services establish the propriety of nurse-led stress testing.[15] The publications in question pertain to *insurance coverage* under federal insurance programs for outpatient diagnostic services *generically*, and do not address the *legality* of

---

[13]    According to Sharp's brief, the Joint Commission accredits hospitals.

[14]    For the same reason, we reject Sharp's contention that it was entitled to judgment as a matter of law on Nosal-Tabor's claim in light of evidence that "numerous individuals," including Nosal-Tabor's supervisors and a union representative, had "confirmed nurse-led stress testing was within [Nosal-Tabor's] scope of practice." Even assuming that these individuals determined that Sharp's procedures complied with the Guidelines, there is nothing in the record outlining their reasoning for making such a determination.

[15]    Sharp lodged the publications with its motion for summary judgment.

*nurse-led stress testing.* Thus, we reject Sharp's contention that "from these [publications from the Centers for Medicare and Medicaid Services] alone, Nosal-Tabor knew there was no legal requirement for cardiologists to be present during a stress test."

In sum, Sharp does not dispute that it terminated Nosal-Tabor for refusing to perform nurse-led stress testing.[16] In light of our conclusion that no reasonable juror could find that Sharp had adopted standardized procedures to authorize nurse-led stress testing that complied with the Guidelines, we further conclude that a reasonable juror could find that Sharp wrongfully terminated Nosal-Tabor when she refused to perform nurse-led stress testing conducted pursuant to Sharp's legally deficient procedures. Accordingly, we conclude that the trial court erred in granting judgment as a matter of law for Sharp on Nosal-Tabor's wrongful termination in violation of public policy.

C.  *The trial court erred in granting judgment as a matter of law for Sharp on Nosal-Tabor's direct claim for violation of Labor Code section 1102.5, subdivision (c)*

Nosal-Tabor claims that the trial court erred in granting judgment as a matter of law for Sharp on her direct claim[17] for violation of Labor Code section 1102.5, subdivision (c).[18]

---

16    For example, in its brief, Sharp states, "[Sharp] terminated Nosal-Tabor because she refused to perform her job duties, namely, the nurse-led stress testing."

17    As noted in parts II.A, and III.B., *ante*, Nosal-Tabor also based her common law wrongful termination claim in part on Labor Code, section 1102.5, subdivision (c).

18    In her complaint and in her brief on appeal, Nosal-Tabor did not specify the subdivision of Labor Code section 1102.5 on which she was basing her claim.  In light of

1.    *Labor Code section 1102.5, subdivision (c)*

As noted in part III.B.1.d., *ante*, Labor Code section 1102.5, subdivision (c) provides:

> "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

2.    *Application*

In its motion for summary judgment, Sharp contended that Nosal-Tabor would be unable to establish her claim for a violation of Labor Code, section 1102.5 subdivision (c) because "[Nosal-Tabor] cannot establish that [nurse-led stress testing] actually violated any state or federal law."

We concluded in part III.B., *ante*, that Sharp's procedures for nurse-led cardiac stress testing failed to comply with the Guidelines and that a reasonable juror could find that Sharp terminated Nosal-Tabor for refusing to perform nurse-led stress testing conducted pursuant to these deficient procedures. In light of this evidence, a reasonable juror could also find that Sharp "retaliate[d] against [Nosal-Tabor] for refusing to participate in an activity that would result in . . . a violation or noncompliance with a state . . . statute . . . or regulation." (Lab. Code, § 1102.5, subd. (c).) Accordingly, we

our conclusion that there is a triable issue of fact with respect to whether Sharp violated Labor Code section 1102.5, subdivision (c), we need not consider whether there is a triable issue of fact with respect to 1102.5, subdivisions (a) and (b), which provide additional protections for employees' whistleblower activities.

25

conclude that the trial court erred in granting judgment as a matter of law on Nosal-Tabor's claim that Sharp violated Labor Code section 1102.5, subdivision (c).[19]

D.     *The trial court erred in granting judgment as a matter of law for Sharp on Nosal-Tabor's direct claim for violation of Health and Safety Code section 1278.5*

Nosal-Tabor claims that the trial court erred in granting judgment as a matter of law for Sharp on her direct claim for violation of Health and Safety Code section 1278.5.[20]

1.     *Governing law*

Health and Safety Code section 1278.5, the health care facility whistleblower statute, "declares a policy of encouraging workers in a health care facility, including members of a hospital's medical staff, to report unsafe patient care. The statute implements this policy by forbidding a health care facility to retaliate or discriminate 'in any manner' against such a worker 'because' he or she engaged in such whistleblower

---

[19]     The trial court also concluded that Nosal-Tabor could not establish her claim for a violation of Labor Code section 1102.5, subdivision (c) because she failed to exhaust her administrative remedies with the Labor Commissioner prior to bringing suit. On appeal, Sharp concedes that the trial court erred in requiring exhaustion, but contends that the court committed "harmless error" because the trial court ruled on the merits of Nosal-Tabor's Labor Code section 1102.5, subdivision (c) claim. We accept Sharp's concession, and conclude that the trial court erred in concluding that Nosal-Tabor was required to exhaust her administrative remedies prior to bringing a claim pursuant to section 1102.5. (See *Satyadi v. West Contra Costa Healthcare Dist.* (2014) 232 Cal.App.4th 1022, 1032; *Lloyd v. County of Los Angeles* (2009) 172 Cal.App.4th 320, 323 [both concluding plaintiff need not exhaust administrative remedy with Labor Commissioner prior to bringing suit for violation of section 1102.5].)

[20]     As noted in parts II.A., and III.B., *ante*, Nosal-Tabor also based her common law wrongful termination claim in part on Health and Safety Code section 1278.5.

action.  ([Health & Saf. Code,] § 1278.5, subd. (b).)"  (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 660-661.)

Health and Safety Code section 1278.5, subdivision (b) provides in relevant part:

"(b)(1) No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done . . . the following:

"(A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity."

Health and Safety Code section 1278.5, subdivision (d) establishes a rebuttal presumption of discriminatory action under the following circumstances:

"(d)(1) There shall be a rebuttable presumption that discriminatory action was taken by the health facility . . . in retaliation against an employee . . . if responsible staff at the facility or the entity that owns or operates the facility had knowledge of the actions, participation, or cooperation of the person responsible for any acts described in paragraph (1) of subdivision (b), and the discriminatory action occurs within 120 days of the filing of the . . . complaint by the employee . . . .

"(2) For purposes of this section, discriminatory treatment of an employee, member of the medical staff, or any other health care worker includes, but is not limited to, discharge, demotion, suspension, or any unfavorable changes in, or breach of, the terms or conditions of a contract, employment, or privileges of the employee, member of the medical staff, or any other health care worker of the health care facility, or the threat of any of these actions."

27

2.    *Application*

Nosal-Tabor contends that she made numerous complaints to her supervisors and to a Sharp compliance hotline concerning nurse-led stress testing, and that she was retaliated against for making these complaints. In opposing Sharp's motion for summary judgment, Nosal-Tabor presented considerable evidence that she had made several complaints to Sharp concerning nurse-led stress testing, including a document describing Nosal-Tabor's October 27, 2011 telephone call to a Sharp compliance hotline in which Nosal-Tabor stated, "I feel unsafe and unethical practices are being performed in [the] cardiac stress testing area endangering [patients] and requests are being made to have nurses practice out of their scope of practice." In her deposition, Nosal-Tabor stated that she repeatedly called the hotline throughout the fall of 2011 in order to inquire as to the status of the investigation concerning her complaint. Nosal-Tabor stated that in January 2012, a person from the hotline advised her that nurse-led stress testing was within the scope of practice for a nurse. The document describing Nosal-Tabor's October 2011 call indicated that in August 2012, Nosal-Tabor's supervisor closed Nosal-Tabor's complaint, and noted, "Department guidelines in accordance with ACC [American College of Cardiology] guidelines approved by Cardiac Advisory Council. This [registered nurse] believes cardiologist needs to be present for stress testing."

In her deposition, Nosal-Tabor stated that she repeatedly told her supervisors that she did not think that Sharp's procedures for conducting nurse-led stress testing

28

"qualif[ied] as a standard[ized] procedure" because "[it] didn't meet . . . the legal guidelines of a standardized procedure for a nurse to practice medicine." Nosal-Tabor explained in her deposition that this was because, in her view, Sharp's procedures "didn't outline competencies, they didn't identify who was able to perform stress tests, [and] they didn't outline a review."

Nosal-Tabor also lodged numerous e-mails in which she raised similar concerns. For example, in a September 16, 2010 e-mail to her supervisor, Nosal-Tabor stated, "I again want to express my concern with nurse-led stress testing. I believe I would be functioning out of my scope of practice." In an October 6, 2010 e-mail to her supervisors, Nosal-Tabor complained about nurse-led stress testing and stated, "This is not legal." In an April 14, 2011 e-mail to her supervisors, Nosal-Tabor sought "clarification of [registered nurse] led stress testing," and requested to see "this new process in writing." On November 8, 2011, Nosal-Tabor wrote to Sharp's chief executive officer concerning a patient and asked, "Please advise if cardiolite[21] stress testing supervision on high risk patients is in the scope of practice for a staff nurse." The chief executive officer responded, "Cardiolite testing is a procedure that is within the purview of nursing practice. Nurses can do stress testing under a standardize[d] procedure." In a February 2012 e-mail to her supervisor, entitled, "Clarification of new procedure," Nosal-Tabor wrote, "It is at the discretion of the cardiology nurse to decide when she/he feels competent to perform stress testing without the [nurse practitioner] present." Nosal-

---

21      Cardiolite is a drug used during some stress testing procedures.

Tabor's supervisor responded, "All [registered nurses] in the stress lab should be competent to perform stress tests WITHOUT the [nurse practitioner] present."

With respect to discipline, Nosal-Tabor presented evidence that on November 8 2011, she received a memorandum entitled, "Clarification of Expectations; Unsatisfactory Performance."[22]  The memorandum stated in part that Nosal-Tabor's "behavior is disrupting the morale in the department and [is] not conducive to good teamwork."  In addition, on March 5, 2012,  Nosal-Tabor received a memorandum entitled "Written Warning, Unsatisfactory Performance."  This memorandum expressly referred to Sharp's expectation that Nosal-Tabor would "complet[e] necessary tests, e.g. Exercise Treadmill tests [i.e. exercise based cardiac stress tests]."  Nosal-Tabor also offered a declaration in which she indicated that she had been given a poor performance review and was suspended without pay in February 2012.  Finally, it is undisputed that Sharp placed Nosal-Tabor on administrative leave and then terminated her employment in April 2012.

Sharp argues that the trial court properly granted judgment as a matter of law on Nosal-Tabor's claim for violation of Health and Safety Code section 1278.5 because

---

[22]     Nosal-Tabor stated during her deposition that she had informed Sharp's management of her October 27, 2011 call to the compliance hotline during a November 3, 2011 meeting.

Sharp established as a matter of law that it had terminated[23] Nosal-Tabor for a legitimate reason, namely her refusal to perform lawful nurse-led stress testing.[24]  Sharp offers two arguments in support of this contention.  Sharp's primary contention is that "Nosal-Tabor's refusal to perform nurse-led stress testing was not reasonable based on the circumstances."  In support of this contention, Sharp refers to the arguments rejected above in connection with Nosal-Tabor's wrongful termination claim.  (See pt. III.B.2., *ante*.)  We reject those arguments for the reasons outlined in part III.B.2., *ante*, and conclude that Sharp did not demonstrate that Nosal-Tabor's objections to nurse-led stress testing was unreasonable, given the legal deficiencies with respect to Sharp's procedures for performing such testing.

Sharp also appears to contend that it was entitled to judgment as a matter of law on Nosal-Tabor's claim for violation of Health and Safety Code section 1278.5 because the

---

[23]    Although Sharp does not specifically address evidence of the disciplinary actions that it took against Nosal-Tabor prior to her termination, we assume that Sharp intends to argue that any disciplinary actions it took against Nosal-Tabor were proper in light of Nosal-Tabor's refusal to perform lawful nurse-led stress testing.

[24]    In its motion for summary judgment in the trial court, Sharp contended that Nosal-Tabor would be unable to establish a prima facie case of retaliation in violation of Health and Safety Code section 1278.  (Citing *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138 ["To establish a prima facie case of retaliation 'a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.' "].)  However, the trial court did not grant Sharp summary judgment on this ground, and Sharp does not raise this argument on appeal.  Accordingly, we address only Sharp's contention that it was entitled to summary judgment on the ground that it established as a matter of a law that any disciplinary actions that it took against Nosal-Tabor were taken for a legitimate nonretaliatory business reason.

undisputed evidence established that Sharp terminated Nosal-Tabor for *refusing to perform* nurse-led stress testing, rather than for *making complaints* concerning Sharp's nurse-led stress testing. We are not persuaded. In light of the evidence of Nosal-Tabor's complaints pertaining to the legality of nurse-led stress testing and the disciplinary actions discussed above, a jury could reasonably find that Sharp retaliated against her for making these complaints. This is particularly so given that many of the complaints and disciplinary actions occurred within 120 days of each other, thereby triggering the rebuttable presumption of discrimination established in Health and Safety Code section 1278.5, subdivision (d)(1).

Accordingly, we conclude that the trial court erred in granting judgment as a matter of law for Sharp on Nosal-Tabor's claim for violation of Health and Safety Code, section 1278.5.

IV.

DISPOSITION

The judgment is reversed. Nosal-Tabor is entitled to costs on appeal.

AARON, J.

WE CONCUR:

HALLER, Acting P. J.

McDONALD, J.

32

Filed 8/27/15

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KAREN D. NOSAL-TABOR, | D065843 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00042433-CU-WT-CTL) |
| SHARP CHULA VISTA MEDICAL CENTER, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | [No Change in Judgment] |

THE COURT:

The opinion filed on August 3, 2015, is ordered certified for publication.

HALLER, Acting P. J.

Copies to:  All parties